# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

AUBREY FERRAO, TINA FERRAO AND
MARK J WOODWARD, AS TRUSTEE
OF LAND TRUST DATED APRIL 5, 1987

      Plaintiffs,

v.

                                 Case No. 2:20-CV-657-FTM-66MRM

ACE INSURANCE COMPANY OF
THE MIDWEST,

      Defendant.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERTS MATTHEW NOLTON, P.E. AND ANDRE G. MELO, P.E.

COME NOW, Plaintiffs, Aubrey Ferrao, Tina Ferrao, and Mark J Woodward, by and through their undersigned counsel, and respond to Defendant Ace Insurance Company of the Midwest's Motion to Exclude Certain Opinions of Plaintiffs' Experts Matthew Nolton, P.E. and Andre G. Melo, P.E. (ECF 73), and in support thereof, states as follows:

### INTRODUCTION

This lawsuit involves a claim for breach of an insurance policy in which ACE has refused to provide coverage for property damage suffered during Hurricane Irma. Plaintiffs claim that the slate roof over their residence in Naples, Florida must be replaced due to extensive windstorm damage suffered during Hurricane Irma. The

Plaintiffs retained Nolton and Melo as experts to opine on causation and physical damage from the storm and to rebut ACE's proposed repair, including the unavailability of matching slate in sufficient quantities. ACE does not challenge their qualifications but seeks to limit them from testifying on uplift damage, the pre-loss condition, methods of repair, and availability of matching slate, on the grounds that they are unreliable, speculative, and unhelpful. ACE's motion should be denied because Nolton and Melo's expert opinions are reliable, not speculative, and will be helpful to the jury.

## MEMORANDUM OF LAW

"The Court has wide latitude in deciding how to determine reliability." *End Time Sabbath Worship Ctr., Inc. v. Landmark American Ins. Co.*, Case No. 6:20-cv-1338-RBD-EJK, 2021 WL 4263364, at *2 (M.D. Fla. July 29, 2021) (citations omitted). "[T]he district court must take care not to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Clena Investments, Inc. v. ZL Specialty Ins. Co.*, 280 F.R.D. at 653, 660 (S.D. Fla. 2012).

Additionally, as for the court's determination of reliability:

> *[A]bsolute certainty is not required.* Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility. *On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.*

*Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (emphasis added). Importantly, "[t]he *Daubert* Court emphasized that the [reliability] inquiry is a 'flexible one.'" *Eberli v. Cirrus Design Corp*, 615 F.Supp.2d 1357, 1363 n.2 (S.D. Fla. 2009) (citing *Daubert*, 509 U.S. at 594).

## A. Nolton and Melo's opinions exceed this Court's threshold standard for reliability.

ACE makes many assertions about the reliability of Nolton and Melo's opinions but fails to inform this Court that ACE's experts used the same approach to conclude that Plaintiffs' slate roof was, in fact, wind-damaged. (*See* ECF 105-1 at 134:18-135:13; 135:23-136:2; 137:19-138:7; 138:20-139:2; 139:16-19; 142:9-25; 164:9-14; 166:3-10: 168:1-3; ECF 103-1 at 112:7-19; 113:7-17; 113:25-114:7; 121:16-122:25.) Moreover, ACE does not dispute that if Plaintiffs' roof is found to have been damaged to the degree that Plaintiffs' experts conclude, then the only appropriate repair is a complete replacement. (*See* ECF 105-1 at 146:14-148:16; ECF 103-1 at 63:16-64:10.) As provided below, ACE's challenges to Nolton and Melo are entirely misplaced.

### 1. *Nolton's Opinions on Uplift are Reliable and Should Be Admitted.*

First, ACE argues that Nolton's opinions about uplift damage are unreliable because "Nolton, admittedly, has not documented, quantified or tested any of the slate tiles or fasteners to determine where any of the fasteners did in fact back out during Hurricane Irma . . . ." (ECF 73 at 10-11.)

ACE is wrong in its contention. Nolton went up onto the roof, **inspected** the

roof, **observed** "broken, chipped slate, … missing slate, … **fasteners that had been pulled up, … lifted slate**," and he reported on his findings. (ECF 88-1 at 27:17-28:3.) (Emphasis added.) He took and analyzed photos. (*See* ECF 88-1 at 33:11-34:2.) He counted broken tiles and reviewed the history of the roof. (ECF 88-1 at 54:16-18; 62:10- 63:23.)

As for any additional testing, this Court has made it perfectly clear that testing is not required for an expert's opinion to meet the reliability standard. Plainly, "testing is not required." *End Time Sabbath Worship Ctr., Inc.*, 2021 WL 4263364, at *3.

In *End Time Sabbath Worship Center*, a party moved to exclude an expert's opinion about the failure of a faulty fire alarm control panel. *Id.* at *1. The alarm panel allegedly malfunctioned due to a lightning strike. *Id.* To form his opinion, the expert "spoke with [representatives of the affected building], inspected the [building], reviewed a lightning report, and talked to [fire] personnel who had previously monitored the [building's] systems." *Id.* at *2. The movant argued that the causation opinion was unreliable because the expert "did not conduct any testing of the fire alarm control panel." *Id.* at *3. The court disagreed and found the expert's opinion reliable because "[c]onducting an investigation and relying on his experience as an electrical engineer, [were] sufficiently reliable bases for [the expert] to form an opinion on the fire alarm control panel's failure." *Id.* at *3.

More importantly, "firsthand observation combined with [] extensive roofing experience" is sufficient methodology to render an opinion about roof damage. *El-Ad*

*Residences at Miramar Condo. Assoc., Inc. v. Mt. Hawley Ins. Co.*, Case No. 09-CV-60723-JORDAN, 2011 WL 13174642, at *5 (S.D. Fla. Feb. 23, 2011). When a "roofing expert possesses genuine expertise in roofing, and [] his opinion draws on that expertise as well as his personal investigation of the roof in question, he may testify." *Id.* at *5.

ACE does not attack Nolton's qualifications, nor can it. Nolton has more than adequate credentials. (*See* ECF 88-1 at 6:2-12:20.) Nolton's opinion is based on "project information . . . , field observations, and [his] experience with similar projects." (ECF 88-2 at 11.) He observed the roof, took photos, reviewed previous engineering reports (including at least one report from ACE's expert), considered the Florida Building Code, and ultimately used this information along with his engineering expertise and experience evaluating roof damage to draw a conclusion about the uplift damage. (*See* ECF 88-2; *see also* ECF 88-1 at 27:17-28:3; 33:11-17; 54:12-18; 64:16-65:9; 114:20-25.) Simply put, Nolton's extensive roofing expertise—which ACE does not dispute—along with his firsthand observation, render his opinions about uplift damage reliable.

After recognizing Nolton's opinion that "**uplifted fasteners … are now compromised**" (which should end the challenge), ACE questions Nolton's concern about "future leaks" and "potential water intrusion" resulting from this observed damaged condition to assert that future damages are not covered under the ACE policy. (ECF 73 at 11.) ACE's argument is entirely misplaced. The uplifted and compromised fasteners constitute present damage, making the roof substantially less

wind and water resistant today than it was before the Hurricane. Ignoring this damage will **not** return the Plaintiffs to their pre-loss condition.

Next, ACE asserts that "[a]s [Nolton] inspected in 2020, he was unable to definitely say there was no footfall damage given the number of persons on the roof prior to his investigation, so some areas could have wind damage or the damage could have been from footfall." (ECF 73 at 11.) Essentially, ACE argues that because too much time had passed between Hurricane Irma and Nolton's physical inspection, Nolton cannot definitively assess causation.

When two experts "undert[ake] essentially the same process for evaluating the cause of damage to the [p]roperty, that fact does suggest that the methodology enjoys at least some acceptance in the engineering community." *Clena Investments, Inc.*, 280 F.R.D. at 663-64.

Here, ACE's Expert (Bart B. Barrett) investigated the property at roughly the same time as Nolton (October 24, 2019—approximately 25 months post Hurricane Irma). (ECF 105-3 at 4.) Barrett's report concluded that "[e]levated wind pressures and/or wind-borne debris impact during Hurricane Irma have resulted in roofing distress . . . [including] distress to the slate roof tiles." (ECF 105-6 at 16.)

By extension, because Barrett was able to draw conclusions about the cause of damage based in part on a visual inspection more than two years after the covered event, the timing of the inspection enjoys at least some acceptance in the roofing community. *See Clena Investments, Inc.,* 280 F.R.D. at 663-64. In short, if ACE's experts can rely on an inspection that occurred more than two years after Hurricane

Irma to prove causation, then so too can Nolton. The timing of the experts' inspections may affect the weight and credibility of their testimony, but it does not render their opinions unreliable. *See Jones*, 861 F.2d at 662.

To be fair and complete, Nolton did not say that there could not be any footfall damage, but that a characteristic look of the breakage (i.e., "the way it goes across the edge") could also be from wind. (ECF 88-1 at 109:15-110:3.) He added, if there was footfall damage, then the slate "would have obviously blown off during the storm." *Id*. He further explained, "[i]f it was fractured, it may have been sitting there **and you would not know** [and] **you would not be able to see until that slate eventually separated** [because of Hurricane Irma]." (ECF 88-1 at 118:13-119:6.)

Nolton's testimony is important for three reasons. First, if there was no footfall, then the damage to the slate is solely caused by wind, which is covered under the Policy. Second, if there was a hidden fracture, whether due to "latent defect, inherent vice, wear and tear [or] marring," and the hidden condition combined with the Hurricane to cause damage, then the damage is covered under the Policy. (*See* ECF 95-1 at 111:19-112:16.) Last, it is ACE's burden to prove that an exclusion applies and set forth what damages are excluded from coverage under the terms of the Policy. [1] *See Fayad v. Calrendon Nat'l Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005) and *Jorqura v. Metro. Cas. Ins. Co.*, Case No: 6:12-cv-1149-Orl-18KRS, 2013 WL 12156452, *1 (M.D. Fla.

---

[1] This same coverage analysis applies to ACE's comment on wind caused "crater damage" at the fastener holes and "aged and deteriorated underlayment" combining with wind to cause a loss (ECF 73 at 11.) ACE's disagreement with Nolton is not a ground to limit his testimony on reliability.

Dec. 19, 2013).

During his deposition, Nolton disagreed with ACE's experts' contention that there are "areas on this roof that would be more likely to have footfall traffic damage." (ECF 88-1 at 127:21-128:5.) ACE's counsel pressed Nolton "Is it possible?" (ECF 88-1 at 128:6-10.) Nolton responded "I guess I have to say yes, it is possible there could be microfractures there." *Id.* Nolton's response does not help ACE. This is because, pursuant to ACE's own experts, "microfractures are fractures that are naturally occurring in the slate rock … from an original construction standpoint" [i.e., latent defects in the original installation 25 years earlier.] (ECF 104-1 at 58:4 – 59:7.)

In short, Nolton's opinions on uplift damage are reliable because his opinions are based on his engineering expertise, personal observations, and a review of additional information about the roof. Whether there was ever footfall damage to the roof is irrelevant. What matters is that based on Nolton's expert evaluation of the roof damage, he was able to determine within a reasonable degree of certainty that Hurricane Irma caused the damage.

2. *Melo's Opinions on Uplift Damage are Reliable and Must be Admitted.*

ACE also argues that Melo's opinions on uplift damage are unreliable because, *inter alia*, "Melo did not perform any tests, although he could have tested the fasteners to determine pullout and remaining capacity." (ECF 73 at 13.) ACE argues that "[a]s he was unable to identify any actual physical damage, this damage is all speculative. . . ." (ECF 73 at 13.) These contentions mischaracterize the evidence and ignore the rigorous methods Melo undertook to develop his opinion. Notably, ACE does not

dispute Melo's qualifications.  (*See* ECF 73.)

First, manual simulation of an uplift test is indeed a reliable methodology, and Melo completed said testing.  In *El-Ad Residences*, the court considered a *Daubert* motion requesting to exclude evidence from an expert opining on roof damages allegedly caused by Hurricane Wilma.  *El-Ad Residences at Miramar Condo. Assoc.*, 2011 WL 13174642, at *5.  The movant argued that the expert's "[m]anual simulation of an uplift test of the roofs' tiles [was] an improper method to determine the damage to the roofs" because "an uplift test is designed to test newly constructed roofs affixed by foam or mortar, not a roof that is several years old and has tiles affixed with screws." *Id.*  The court rejected the movant's argument because "the methodology underlying [the expert's] opinion—namely, firsthand observation combined with his extensive roofing experience—[was] sufficiently reliable to admit at trial."  Further, "because the roof expert possess[ed] genuine expertise in roofing, and because his opinion [drew] on that expertise as well as his personal investigation of the roof in question, he [was allowed to] testify."  *Id.*  Hence, the court took no issue with the reliability of the expert's manual simulation of an uplift test, and rather reiterated that the movant's arguments went to the weight of the evidence and not admissibility.  *See id.*

Melo undertook the same admissible uplift test as described in *El-Ad Residences*. In his deposition, Melo testified:

> Q:     All right. Let's see. You've got "Widespread uplifted slate tiles observed in nearly all roof slopes." So you are correlating that to Hurricane Irma?
>
> A:     That's correct.
>
> Q:     How did you correlate that?

> A:    Well, these are -- **when I talk about widespread uplifted slate tiles, I mean tiles that are either not seated completely in their originally installed positions, or that upon hand manipulation, I am able to see that there is a good amount of play where I can lift, you know, the tiles in many areas with my hand**.

(ECF 81-1 at 36:8-20.)  (Emphasis added.)

Just like the movant in *El-Ad Residences* did "not offer [] any case law, published materials, or other evidence demonstrating that [the expert's] methods and the information forming his opinions [were] not sufficiently reliable," nor has ACE in regard to uplift testing. *El-Ad Residences at Miramar Condo. Assoc.*, 2011 WL 13174642, at *5.  ACE's argument that Melo's opinion is unreliable is "based merely on the argument of its counsel." *See id.*

Further, ACE claims that Melo did not "identify any actual physical damage" or any "actual functional damage." (ECF 73 at 13.)  They claim that Melo's opinions are based on speculative, "hidden" damages.  *Id.*  They claim that Melo "did not identify any method or process for determining these opinions." *Id.*

Again, ACE disregards the evidence.  ACE's Motion implies that this damage is hidden in that it is speculative or imaginary.  "Hidden" is really a misnomer.  Rather, the "hidden" damage that Melo refers to is damage not visible by the human eye—it is hidden by the slate tiles themselves.  Notably, even ACE's expert, Barrett, refers to this hidden damage—"hidden defects that may exist that were not readily visible." (ECF 105-1 at 159:24-160:22.)  It is not as though it doesn't exist. To make the leap from hidden to speculative as a basis for this argument is improvident.

Melo visited the site, undertook an extensive technical review of other expert

reports and historical documentation concerning the roof, and performed his own analysis. (*See* ECF 81-8.) He also checked the underside of the roof (in the attic, below the plywood sheathing) for further evidence of fastener pullout. (ECF 81-1 at 67:17-68:3.)[2] Despite ACE's claims, through Melo's extensive efforts, he did, **in fact**, find actual wind-uplift damage. For example, he testified:

> Q: Okay. Okay. **How did you approximate 50 percent of it being damaged**?
> A: **So that was based on the physical damage that was there**. That's, you know, the displaced and uplifted tiles, the displaced ridges and hips, so that – the physical damage to the actual tiles themselves, and then this wider, more widespread occurrence of pried nails and spalling around the fastener holes. And so there is three different indications of this more widespread condition that I attribute to uplift damage, and so that was evidenced by the uplifted nails that were observable from the surface, the spalling around the nail holes, as well as these uneven protrusions of the nails as viewed from the inside of the attic that indicates that they were pulled up. And so I believe that based -- like I said, when you see this more severe type of damage, which is the breakage and the effects to the ridges and hips, there is statistically a higher amount or a more widespread amount of the lower form of damage of uplift damage, which, as I just said, was evidenced by these uplifted nails, the spalling, and the uneven protrusions of the nails on the deck or the underside of the deck.

(ECF 81-1 at 77:20-78:17.) Based upon his qualifications, experience, and personal investigation, Melo clearly explains what he found on the roof and why the damage he observed is attributed to the hurricane. In his report, Melo provides an extensive discussion about tile damage progression, and why this uplift damage is truly damage to the roof in and of itself. (*See* ECF 81-8 at 23-24.) He explains how the uplift contributes to the total catastrophic failure of a roof system. (ECF 81-8 at 23-24.) Melo explains how tile uplift (which ACE's experts agree can happen) occurs before

---

[2] Although ACE's experts were also in the attic space, they never checked the fasteners below for pullout. (ECF 105-1 at 180:23-181:24.)

tile breakage and blow-offs—both of which (breakage and blow-offs) ACE has admitted. (ECF 81-8 at 23-24.; ECF 105-3; ECF 105-1 at 156:18-157:15.) Again, "firsthand observation combined with [] extensive roofing experience" is sufficient methodology to render an opinion about roof damage. *El-Ad Residences at Miramar Condo. Assoc., Inc.*, 2011 WL 13174642, at *5.

At trial, ACE will have the opportunity to "ferret out" on cross-examination any alleged weaknesses of Melo's opinions, but his opinions on the uplift damage of the roof are sufficiently reliable and must be allowed. *See Centre Hill Courts Condo. Assoc., Inc v. Rockhill Ins. Co.*, Case No. 19-cv-80111-BLOOM/Reinhart, 2020 WL 475633, at *7 (S.D. Fla. Jan. 28, 2020) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

    2. *Nolton and Melo's Opinions on the Prior Condition of the Roof are Supported and Reliable and Must Be Permitted.*

ACE argues that Nolton and Melo's opinions on the prior condition of the roof are unsupported and unreliable, because, in part, both experts relied on "vague invoices" for prior repair work. (ECF 73 at 14, 16). ACE claims that "the conclusion that everything was repaired is unsupported and unreliable." (ECF 73 at 16.) They claim that Melo's opinion is unreliable because "he relied on no other information to come to his conclusion on the pre-loss condition of the roof other than the invoices from GWR." (ECF 73 at 16.) ACE claims that Nolton's opinions are "unreliable and unsupported by the documents" because he based his opinion on "vague invoices and limited photographs." (ECF 73 at 14.)

*Centre Hill Courts Condo. Assoc., Inc.* instructs that an expert's "consideration of the historical information provided by [an] insured are challenges to the weight of his testimony, rather than its reliability. . . which *must* be evaluated by the jury." 2020 WL 475633, at *4 (S.D. Fla. Jan. 28, 2020) (emphasis added). In *Centre Hill Courts Condo. Assoc.*, "a condominium association [brought an] action against [its insurance company] for the recovery of proceeds and benefits allegedly owed under an insurance policy" for damages to a roof sustained during Hurricane Irma. *Id.* at *1. Subsequently, the insurer brought a *Daubert* motion to exclude the opinions of the insured's experts arguing, in part, that the opinions were unreliable. *Id.* at *1, *3. The insurer argued that at least one expert "used unreliable methodology because his conclusions concerning the pre-loss roof conditions [were] based solely on unverified, unreliable information from [the insured's] condominium board president." *Id.* at *3.

The expert in question, "a registered Professional Engineer in the State of Florida with 29 years of experience," based his opinion on several sources of information. *Id.* at *4-*5. He "reviewed photographs of the damage sustained that were taken soon after Hurricane Irma struck, together with weather data generated during the storm, and he conducted a lengthy site inspection[3] of the [p]roperty, all of which were used to verify the historical information supplied [by the insured] and substantiate his ultimate opinions." *Id.* at *4.

---

[3] Notably, the expert "did not inspect the roof until two years after the loss, during which time, . . . repairs had been made to the [p]roperty." *Id.* at *3. Despite this lapse in time and subsequent repairs to the roof, the court still found the expert qualified and his opinion reliable. *See id.* at *3-*5.

The court found the opinion reliable and instructed that a "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at *4 (citations omitted).

The *Centre Hill* court also evaluated the reliability of a second expert's opinion. With regard to this second expert, the insurer challenged the reliability of his opinion averring that "he [could not] offer opinions regarding damages or pre-loss roof conditions because he did not review any historic information in the pre-loss condition of the [p]roperty." *Id.* at *7.

Yet again, the court found this argument unavailing. The expert based his opinion upon "widely accepted industry tests for evaluating roofing systems." *Id.* Further, the expert explained that those assessments "[did] not rely on or require maintenance records to be an accurate, scientific inquiry leading to an opinion within a reasonable degree of professional certainty." *Id.* The court refused the insurer's argument and opined that "arguments regarding the lack of historical information . . . is an argument that goes to the weight of the evidence, rather than the admissibility." *Id.*

In the instant case, the allegedly "vague" invoices upon which Melo and Nolton relied are not vague at all. But, even if they were, *Centre Hill* instructs that prior invoices are not required to opine on pre-loss conditions. Beyond this, Nolton even testified that he had a conversation with Gulf Western Roofing, giving him a clear understanding of roof's repair history:

Q: Okay. Yeah, it did say that you had a discussion with the owner of Gulf Western Roofing, but what did he tell you?

A: Well, all he did was he verified that they had been doing maintenance on the roof since, I think it was, 2010. . . .

(ECF 88-1 at 63:11-16.)

Q: Did the owner of Gulf Western tell you if they were out there, you know, doing like a maintenance of checking every single tile on the roof or were they just addressing issues, if he told you?

A: What I understood is that one of the times they did an overall review of the roof and did repairs kind of like to bring it up to good condition. . . .

(ECF 88-1 at 68:19-25.) Nolton and Melo's extensive review of documents, photographs, conversations with those familiar with the history and repairs of the roof, and in-person investigations—all recounted repeatedly in this Response—is more than enough for their opinions to survive *Daubert*.[4]

3. *Nolton's Opinions Concerning the Method of Repair are Reliable and Must Be Admitted.*

It is ACE's position that "Nolton's opinions concerning the prior repair work by GWR as proof of the roof being properly maintained and in good condition refutes his opinion that the methods of repair recommended by ACE's slate expert and building consultant are improper." (ECF 73 at 16.) ACE's conclusion is a stretch too far. A closer inspection of Nolton's deposition reveals:

A: So if you look at, again, the -- that is the -- I think that was the National Slate Association. I'd have to look back and see what you're talking about. When I've got one repair of a slate tile, I'm going to repair that tile. If I've got two or three or more that they

---

[4] Incredibly, ACE attacks Nolton and Melo on their consideration of available information on the maintenance for 6 years prior to Hurricane Irma, yet ACE's experts never even investigated the history of this roof when they concluded that the roof was not maintained. (*See* ECF 104-1 at 59:8-17; 60:18-20; 80:2-3; 80:4-5; 272:23-25; 194:16-22; 273:5-16.)

> don't -- because, again, they're using those bibs or those hooks,
> they don't recommend having those all around each other
> because they're not -- they won't -- they don't put the roof back in
> the same condition before you do that repair. There are methods
> to repair it, but they don't give you the same type of roof that you
> had prior to that repair. So, in those areas, what they want you
> to do is they want you to take the shingled slate off in a pyramid
> so then that you can replace it just as you would original. So if I
> pull them off shingled, I can put them back shingled and I can
> use copper nails through the slate holes and not have to
> use the bibs, the straps, or the hooks.

(ECF 88-1 at 72:11-73:5.)  ACE's counsel then questioned Nolton about the prior repairs.  Nolton's opinions were consistent:

> Q:    Okay. Did you see any examples of that in the prior repairs?
>
> A:    I saw no areas like there had been a large quantity of slate done.
>       It was mostly like the picture we saw where there's one or two
>       that were of enough different color that they appeared that they
>       were repaired or there was some adhesive that appeared that it
>       was one of the repairs. So, no, I had not seen that.

(ECF 88-1 at 73:16-24.)  Whether or not this hook and bib repair method was satisfactory to fix a few, sporadic tiles is irrelevant.  Nolton's opinion, based on his expertise, experience, and personal observations, has consistently been that it is not an appropriate repair method for multiple damaged tiles.  This is especially true when a roof was admittedly wind-uplift damaged throughout by a substantial wind event like Hurricane Irma. In summary, Nolton is not "argu[ing] that slate roofs simply cannot be repaired."  (ECF 73 at 17.)  Rather, it is his opinion that due to the widespread damage observed at the Ferrao's home, ACE's proposed repair method cannot sufficiently return the roof to its pre-loss condition.  (ECF 88-1 at 118:3-12.)[5]

---

[5] ACE takes issue with Nolton's conclusion that "industry standard methods of repair for slate roofs cannot be used in Florida because they are not endorsed in the Florida Building Code or via a Florida Product Approval."

4. *Melo's Opinions Concerning the Method of Repair are Reliable and Must Be Admitted*

ACE suggests a similar issue with Melo's opinion—that he cannot opine that "industry standard repairs would be inappropriate despite their prior use." (ECF 73 at 18.) This, again, misses the mark. Melo testified:

> Q:     Now, for the repairs we are looking at, the hooks and the bibs, would that be okay in certain sections? Could you use that in the field if it was, you know ...
>
> A:     Yeah. Again, I don't have any specific concerns with hook or the known bib or the hook repair methods. To be honest, those are the only repair methods that are available to do -- insert or an individual replacement in these slate tile roofs.  The problem I have is with doing such extensive repairs that are concentrated all over or -- they are not concentrated in one specific area, they are all over the roof. And so I think that will have certainly a negative impact on the overall roof as far as the attachment of the tiles goes -- of the slate tiles goes and as far as even their ability to be able to seal the holes from the original fasteners . . .

(ECF 81-1 at 143:17-144:9.)  ACE's argument that Melo's opinions are inconsistent is inaccurate and misleading. ACE's *Daubert* challenge on this ground should be rejected.

5. *Nolton's Opinions on Matching Tiles are Reliable and Must be Admitted*

Finally, ACE attacks Nolton's opinion that "repair materials are not available and therefore the entire roof has to be replaced due to matching concerns."[6] (ECF 73 at 19.)  Nolton's opinion is based on his knowledge of the industry and his expertise. As a reminder, Nolton is a licensed professional engineer _and_ a licensed general contractor.  (ECF 88-1 at 10:6-21.)  He testified:

> Q:     Okay. You commented that it would be impossible to find

---

(ECF 73 at 16.)  The appropriate way for ACE to challenge this conclusion is on cross-examination. For a detailed discussion of Florida's Product Approval requirement, refer to ECF 80 at 9-13.

[6] For further discussion about the availability of matching slate see ECF 80 at 13-14.

matching slate. Is that just because they used the different colors with the repairs, or what's that predicated on?

A:     What it's predicated on is my experience with roofs in general, the so-called boneyards. Right? I've never found one. Right? I know there may be some somewhere, but I've never found them. The only way that we've ever been able to do any kind of that is when they had multi buildings and harvesting from one building and going to another building and then replacing the whole roof on one of the buildings. And in the slate there's one – I think there's one guy listed on the slate contractors for Florida, right, and -- but no one -- from my experience, they're not around. They're not available.

Plus, then you add into, these aren't man made. Right? So roof tiles, concrete tiles, and ceramic tiles were man made, so you had thousands, tens of thousands, hundreds of thousands of them, versus slate all comes from a quarrying process.

Within that quarry the slate can change over time. And so you would try to -- you would have to find something that was of the same size first, that they were manufactured from the quarried stone in the same size with the same kind of finish and in a relatively same color to be able to find it. It's just there are so many steps to try to do that you're never going to find 1,200, let alone 5,000 pieces that will match that slate out there.

ACE's issues with Nolton's opinion do not trigger an issue of reliability; rather, per *Bray*, if ACE disagrees with Nolton's *conclusion* that it would be impossible to find matching slate in the quantities ACE suggests would be needed to repair this roof, ACE "…can challenge these conclusions by cross examination or offer the testimony of their own expert witness, and the jury can decide the matter by weighing the testimony of the competing experts." *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, No. 6:07-cv-326-Orl-DAB, 2009 WL 1046354, at *4 (M.D. Fla. Apr. 20, 2009).

## B. Nolton and Melo's opinions will be helpful to the trier of fact and thus should be admitted.

An expert's "testimony must assist the trier of fact through the application of

expertise to understand the evidence or determine a fact in issue." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329 (11th Cir. 2010) (citations omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Centre Hill Courts Condo. Assoc., Inc.*, 2020 WL 475633, at*7. Helpfulness turns on:

> the commonsense inquiry of whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*End Time Sabbath Worship Ctr.*, 2021 WL 4263364, at *3.

In *Centre Hill Courts Condo. Assoc., Inc.*, the insured sought to exclude the expert opinion of a professional roofing inspector arguing it would not be helpful to the jury. *Centre Hill Courts Condo. Assoc., Inc.*, 2020 WL 475633, at*7. The opinion in question was "a report on the damage to the [insured] [p]roperty's roofing systems" after Hurricane Irma. *Id.* at *1, *7. The court disagreed with the movant's position, finding:

> [The] testimony [would] assist the trier of fact in understanding the Hurricane Irma-related damages to the [p]roperty's flat roofing system in particular and the necessary repairs recommended. Further, [the expert's] testimony [would] explain to the trier of fact why certain methodologies are important for determining the damage to roofing systems. . . . Such matters are beyond the understanding of a lay person and thus are appropriately presented through expert testimony.

*Id.* at *8. *See also Clena Investments, Inc.*, 280 F.R.D. at 665 ("[The expert's] knowledge and training that enable him to opine [about hurricane damage to a roof] are not universally shared and fall outside the realm of the average person's understanding.");

*Bray & Gillespie IX, LLC*, 2009 WL 1046354, at *5 ("[E]ngineering testimony regarding damages incurred and estimated repair or replacement costs is relevant and would enlighten the jury.").

Here, Nolton is expected to provide his expert opinion on the cause of the damage and the impact of building codes on the scope of required repairs. Melo is expected to provide his expert opinion about the cause of the damage and potentially the scope of the damage. The case law is clear—these topics are far beyond the "realm of an average person's understanding." *Clena Investments, Inc.,* 280 F.R.D. at 665. A commonsense inquiry would, indeed, render these opinions helpful to the trier of fact.

## C. Conclusion

In summary, both Nolton and Melo's opinions rest on a reliable foundation and would be helpful to a trier of fact.

Respectfully submitted,

*/s/ Meghan C. Moore*
**Meghan C. Moore, Esq.**
Florida Bar No. 668958
Meghan.moore@flastergreenberg.com
**Nicole A. Josephy, Esq.**
Florida Bar No. 124492
nicole.josephy@flastergreenberg.com
FLASTER GREENBERG PC
2255 Glades Road, Suite 324A
Boca Raton, FL 33431
Tel: (561) 961-4508
***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via CM/ECF on September 19, 2022, on all counsel or parties of record:

| | |
|---|---|
| Edward K. Cheffy, Esq.<br>ekcheffy@napleslaw.com<br>ffharper@napleslaw.com<br>David A. Zulian, Esq.<br>dazulian@napleslaw.com<br>glhamilton@napleslaw.com<br>Debbie Sines Crockett, Esq.<br>dscrockett@napleslaw.com<br>esadams@napleslaw.com<br>glhamilton@napleslaw.com<br>Cheffy Passidomo, P.A.<br>4100 W. Kennedy Blvd., Suite 335<br>Tampa, FL 33609<br>Tel:  (239) 261-9300<br><br>*Attorneys for Plaintiffs* | Ricardo A. Reyes, Esq.<br>rar@tobinreyes.com<br>Tobin & Reyes, P.A.<br>225 NE Mizner Blvd., Suite 510<br>Boca Raton, Florida 33432<br><br>*Attorneys for Plaintiffs* |
| Kristin Wood Elza, Esq.<br>kelza@butler.legal<br>Thomas Keller, Esq.<br>TKeller@butler.legal<br>KNieman@butler.legal<br>Butler Weihmuller Katz Craig LLP<br>400 N. Ashley Drive, Suite 2300<br>Tampa, Florida 33602<br>Telephone: (813) 281-1900<br>Facsimile: (813) 281-0900<br><br>*Attorneys for Defendant* | |