UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

AUBREY FERRAO, TINA FERRAO AND
MARK J WOODWARD, AS TRUSTEE
OF LAND TRUST DATED APRIL 5, 1987,

   Plaintiffs,      CASE NO.  2:20-CV-657 FTM-66MRM

v.

ACE INSURANCE COMPANY OF
THE MIDWEST,

   Defendant.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

   Plaintiffs, Aubrey Ferrao, Tina Ferrao, and Mark J Woodward (collectively "Plaintiffs" or the "Ferraos") by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, hereby file this Response in Opposition to Defendant, ACE Insurance Company of The Midwest's ("ACE") Motion for Summary Judgment ("ACE's MSJ"), and as grounds state:

## I. INTRODUCTION

   ACE's MSJ misconstrues facts and law and urges this Court to grant summary judgment in error as follows. First, ACE asserts that Plaintiffs failed to provide timely notice under the Policy, but ACE cites to a deleted Notice provision and fails to inform this Court that notice was timely under the operative Notice provision, as confirmed by ACE's own corporate representative. Second, ACE asserts that Plaintiffs have failed to show evidence of damages in excess of the deductible, an assertion that is

overwhelmingly contradicted by substantial record evidence. Third, ACE asserts there is no evidence concerning the appropriate measure of Loss of Use damages, but the Policy sets forth the measure of damages, and there is evidence aplenty that such damages will be incurred by Plaintiffs while roof replacement is underway. Fourth, ACE seeks a dispositive ruling that termite damages are not covered, but no termite damages have been claimed by Plaintiffs. Fifth, ACE asserts that Plaintiffs' damages are speculative, but numerous record facts demonstrate the opposite. Sixth, ACE unreasonably relies upon the Policy's Water Damage exclusion, which *only* bars coverage for *underground* and *surface water*, in an attempt to bar coverage for wind driven rain. Seventh, ACE asserts that the Policy does not cover matching, but the Policy contains a matching provision, ACE's corporate representative has acknowledged the Policy covers matching, and the case law cited by ACE supports a finding that the Policy covers matching.

For these reasons, further discussed below, ACE's MSJ should be denied as a matter of law or because genuine issues of material fact preclude summary judgment. In support of this Response, Plaintiffs rely upon deposition testimony and exhibits in the record[1] as well as affidavits from Craig Kobza ("Kobza Aff."), the principal of Aerial Companies ("Aerial"), and Todd Denahan ("Denahan Aff.") of Jack Brown & Associates ("JBA"), attached hereto as **Exhibits "L" and "M",** respectively. Plaintiffs

---

[1] Relevant excerpts of the deposition transcripts of J. Parisi [ECF 77-1], A. Melo [ECF 81-1], M. Nolton [ECF 88-1], H. Sienema [ECF 75-1], C. Kobza [ECF 83-1], F. Sajtar [ECF 79-1], J. Kelly [ECF 103-1], J. Womack [ECF 95-1], C. Brandon [ECF 104-1], B. Barrett [ECF 105-1], and B. Waller [ECF 107-1] are attached hereto as **Exhibits "A" – "K"**, respectively.

also rely upon the Declaration of Joseph Parisi ("Parisi Dec."), attached hereto as **Exhibit "N"**.

## II.   RESPONSE TO STATEMENT OF MATERIAL FACTS

1.   Admitted.

2.   Denied. The 558 Notice of Construction Defects was issued prior to Hurricane Irma in connection with defects associated with windows and doors, not the roof. The roof was not inspected in connection with the 558 Notice. Following Hurricane Irma, remediation work was performed to address the window and door defects. In connection with that remediation work, on or about May 27, 2019, Craig Kobza ("Kobza") for the first time inspected a dormer window using scaffolding to access the roof. It was then that he discovered broken, dislodged, and uplifted tiles on the roof. Roof inspections took place thereafter. [Ex. L, ¶¶3-5, 12-14.]

3.   Denied as phrased. *See* response to paragraph 2 above. A permit was issued and a notice of commencement was filed in December of 2018 for work limited to remediation and replacement of windows and doors. Windows and doors were inspected in connection with that work. [*Id.*]

4.   Denied. Safety ropes were utilized by painters in May of 2019, the same month the roof damage was discovered. The safety ropes were not anchored to the roof. They were anchored to the chimney. [*Id.* at ¶13.]

5.   Denied as phrased. Aerial performed paint work in connection with the window remediation work. [*Id.* at ¶5.]

6.     Denied. Termites were found during a soffit repair in an isolated area above the study on April 15, 2019. [*Id.* at ¶¶6-9.]

7.     Denied. While termite damage to a roof truss was observed on the western elevation of the home, it was not observed on other elevations. The roof was not structurally damaged by termites. Although not required to address the termite damage or required by code in the absence of roof replacement, Aerial recommended that all the roof to wall truss connections be upgraded to strengthen them because it makes them more wind-resistant. [Ex. L, ¶¶6-10.]

8.     Denied. A draft permit application and letter prepared by Aerial referenced termite damage repairs and truss upgrade work, but the truss upgrade work was not required to repair termite damage. [*Id.* at ¶¶10-11.]

9.     Denied. The roof damage was first discovered by Kobza on or about May 27, 2019. Kobza arranged for a drone survey and inspection of the roof, both of which took place on May 29, 2019. [*Id.* at ¶¶13-16.] JBA performed a limited inspection of the roof and reported observations on May 30, 2019. [Ex. M, ¶¶4-7.] The report's reference to "360 chipped, cracked and broken slates" was merely an approximation based on obviously broken tiles Todd Denahan ("Denahan") viewed during his inspection. [*Id.* at ¶9.]  It was not a complete account of wind trauma or other wind damage on the roof. [*Id.* at ¶¶4-13.]  Denahan also confirmed the extent of the damage from Hurricane Irma required a total roof replacement. [*Id.* at ¶12.]

10.     Denied as phrased. On June 18, 2019, Plaintiffs' representative emailed Plaintiffs' insurance agent, notifying the agent of Hurricane Irma damage to the roof

and informing the agent of the Hurricane Irma damage investigation underway. The email's reference to having not been told about roof damage after Irma was referring to a groundskeeper, who did not inspect the roof. [ECF 77-1 at 25:24-26:11.] Plaintiffs were unaware of Hurricane Irma damage to their roof until Mr. Kobza informed them of the damage in late May 2019. [*Id.* at 30:23-31:9, 43:4-21.]

11.     Denied. The loss was reported by the Insureds to their insurance agent on June 18, 2019, with the intention that ACE would be notified by the agent. [*Id.* at 24:2-22.]

12.     Denied. ACE was permitted to inspect the property at any time. Despite Plaintiffs' efforts, an inspection could not be coordinated with ACE's adjuster and consultants until October 10, 2019. [Ex. N, ¶¶4-6.]

13.     Admitted that inspections were performed by JBA, Roofcrafters, Case Strategies Group, Gulf Western Roofing, Principled Engineering, and Aerial prior to October of 2019. Otherwise denied. ACE was permitted to inspect the property at any time. [Ex. N, ¶4.]

14.     Denied. Plaintiffs' slate tile roof suffered substantial wind-uplift damage in addition to numerous broken tiles. [ECF 81-1 at 77:20-78:17 (explaining 50% storm damage); ECF 88-1 at 33:11-34:2, 54:16-18 (counting broken titles).]

15.     Denied. Plaintiffs' expert, Andre Melo ("Melo"), observed wind-uplift damage and provided extensive detail about tile damage progression and why uplift damage is damage to the roof. [ECF 81-1 at 77:20-78:17; ECF 81-8 at 23-24.] Plaintiffs' expert, Matthew Nolton ("Nolton"), opined that due to the widespread damage he

5

observed at the Ferraos' home, ACE's proposed repair method could not sufficiently return the roof to its pre-loss condition. [ECF 88-1 at 118:3-12.]

16.    Denied. Plaintiffs do not seek HVAC water damages as part of their claim. [ECF 77-1 at 56:19-57:9.] Plaintiffs' expert opines that library damages were the result of Hurricane Irma. [ECF 75-1 at 29:5 - 30:5.]

17.    Denied as phrased. Plaintiffs' experts do not "assert", they opine that the roof must be replaced in its entirety. Their opinions are not based on "purported" facts. Rather, they are based on damages observed by them, facts known to them, evaluations done by them, and their experience and expertise. [ECF 88-2; ECF 88-1 at 27:17-28:3, 33:11-34:22, 54:12-18, 64:16-65:9, 114:20-25; ECF 81-1 at 77:20-78:17; ECF 81-8 at 23-24.]

18.    Denied as phrased. Plaintiffs' experts opine that because the roof must be replaced, it must comply with current code requirements for roof to wall connections. [ECF 81-1 at 165:1-6; ECF 88-2 at 12.] Defendant's experts and corporate representative agree that if Plaintiffs' roof must be replaced, it will be necessary to perform this work. [ECF 95-1 at 107:12-18; ECF 105-1 at 27:25-30:1.]

19.    Denied. Coverage is not limited to "direct physical loss."  Rather, the Policy insures "against financial loss if the things you own are damaged or lost" and covers "*your* property against physical damage or loss." [ECF 95-4[2], p. 54.] In fact, there is no reference to "direct loss" anywhere in the coverage grant (the Losses We

---

[2] Relevant excerpts of the Policy [ECF 95-4] are attached hereto as **Exhibit "O"**.

Pay For section). Rather, "direct loss" is only referenced in Losses We Won't Pay For and applies only where noted in ACE's exclusions. [*Id.* at p. 56.]

20.    Admitted.

21.    Denied. The Policy contains an endorsement that replaces the notice provision cited with a provision that requires notice of a hurricane claim to be made within three years of a hurricane. [*Id.* at p. 94.]

22.    Admitted that the excerpt is included in an endorsement. That endorsement does not replace or modify the Policy's Notice provision. A separate Florida Home Endorsement replaces the Notice provision. [*Id.*]

23.    Denied as phrased. During the pendency of the litigation, after initial expert disclosures, Plaintiffs' consultants determined that Plaintiffs would be unable to occupy their Florida home while roof replacement was underway. [ECF 77-1 at 65:3-17.] Accordingly, Plaintiffs engaged experts to quantify the cost to rent a comparable substitute home and updated their claim to include additional living expense damages. [ECF 75-2 at 4-5; ECF 79-1 at 9:4-5, 11:6-19.]

24.    Denied for the reasons stated in Paragraph 23.

25.    Admitted.

## III.    MEMORANDUM OF LAW

### A.    <u>Notice Argument</u>

#### i. **Plaintiffs Timely Complied with The Policy's Notice Provision.**

ACE asserts that Plaintiffs failed to provide timely notice of their Hurricane Irma loss and have thus forfeited coverage under the Policy. In doing so, ACE

unapologetically misrepresents the operative language in the Policy and invites judicial error. ACE's argument is factually and legally wrong.

The Insureds complied with the notice provision in the Policy. The Policy only requires notice within three years of a hurricane. ACE's corporate representative admits this. [ECF 95-1 at 114:4-115:22,125:3-7.] Yet incredibly, ACE has quoted policy language that has been deleted from the Policy by endorsement in support of its position that the Insureds failed to provide "prompt" notice. [ECF 74, p. 11-12.] The endorsement that replaces the Policy's deleted language states:

> The first sentence under **Step Two: Notify Us** is deleted and replaced by the following:
>
> *You* must give prompt notice to *us* or *our* agent, **except that a claim**, supplemental claim or reopened claim **for loss or damage caused by hurricane** or other windstorm **must be given to us in accordance with the terms of this policy within three years after the hurricane made landfall** or the windstorm caused the covered damage. (Supplemental claim or reopened claims means an additional claim for recovery from *us* for losses from the same hurricane or other windstorm which *we* have previously adjusted pursuant to the initial claim.) (Emphasis added).

[ECF 95-4, p. 94.]  It is undisputed Hurricane Irma made landfall in Naples, Florida on September 10, 2017. It is also undisputed that the Insureds provided ACE notice on or before August 23, 2019, which was "within three years after the hurricane made landfall." [ECF 95-1 at 125:3-7; ECF 95-4, p. 94.] ACE cannot deny these undisputed facts. Accordingly, ACE's MSJ on notice should be denied.

ACE asserts that "[r]eporting a loss *within the limitation period set forth in the policy* or under statute is irrelevant," citing to *Yacht Club on the Intracoastal Condo. Association Inc. v. Lexington Ins. Co.,* 599 Fed. Appx. 875 (11th Cir. 2015). In *Yacht Club*

the insured asserted that because there was a separate provision in the policy requiring suit to be filed within five years, the insured's notice should be deemed prompt if provided within five years. The Eleventh Circuit disagreed, explaining that a limitation provision regarding the timing of filing suit against the carrier has nothing to do with the timing of when an insured must provide notice pursuant to a notice provision. *Yacht Club* does not stand for the proposition that policy terms are irrelevant and should be ignored. Rather, *Yacht Club* gave effect to the notice provision at issue in that case, which required "prompt notice of the loss or damage," and found that notice first given 4 years and 7 months after a hurricane was not prompt. *Yacht Club* is inapposite here because the Ferrao policy does not require "prompt" notice of a hurricane claim. It requires notice within three years of a Hurricane. [ECF 95-1 at 125:3-7; ECF 95-4, p. 94.] Here, because the Insureds provided ACE notice within three years after Hurricane Irma made landfall in Naples, any argument about what constitutes "prompt notice" and whether ACE has been prejudiced is completely irrelevant to the undisputed facts, the correct Policy language, and this action. Therefore, ACE's MSJ on notice grounds should be denied.

### ii. ACE Has Not Been Prejudiced.

Finally, even if notice had been untimely,[3] a fact question would exist concerning whether the insurer suffered prejudice. *See e.g., Allstate Fire & Cas. Ins. Co.*

---

[3] Even if the Policy required "prompt notice" (it does not), summary judgment would be inappropriate because the Insureds first learned of Hurricane Irma roof damage on May 29, 2019 and reported the loss to their agent on June 18, 2019. [ECF 77-1 at 42:7-43:21, Ex. 7.] *Yacht Club*, 599 Fed. Appx. at

*v. Duong Thanh Ho*, 2012 U.S. Dist. LEXIS 16729, at *24 (S.D. Fla. Feb. 10, 2012); *Niesz v. Albright,* 217 So. 2d 606, 608 (Fla. 4th DCA 1969); *Allstate Floridian Ins. Co. v. Farmer*, 104 So. 3d 1242, 1250 (Fla. 5th DCA 2012). Under Florida law the failure to provide timely notice only creates a presumption of prejudice in favor of the insurer. The insured can overcome that presumption by demonstrating that the insurance company was not prejudiced in its investigation of the loss. *Id.; see also Tiedtke v. Fidelity & Cas. Co. of New York*, 222 So. 2d 206, 209 (Fla. 1969 (mere speculation of prejudice is not enough); *see also Allstate Floridian Ins. Co. v. Farmer*, 104 So.3d 1242, 1250 (Fla. 5th DCA 2012) (insurer cannot avoid coverage in the absence of prejudice because it violates the general rule against forfeiture").[4]

Here, ACE was able to inspect the roof before repairs were made, and all of its experts were able to determine to a reasonable degree of certainty that Hurricane Irma damaged the roof. [ECF 105-1 at 65:17-21, 142:9-20, 164:9-14, 212:6-214:6, Ex. 15; ECF 104-1 at 109:6-9; ECF 95-1 at 246:10-22.]  Accordingly, ACE was not prejudiced in its investigation of the claim. *See Playa Del Mar Ass'n, Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, 2012 WL 13005553, at *15-16 (S.D. Fla. Feb. 3, 2012) (finding no prejudice where the insurers' adjuster testified that the timing of notice did not affect his ability to adjust the claim).

---

879 ("there is no 'bright-line' rule under Florida law setting forth a particular period of time beyond which notice cannot be considered 'prompt.'").

[4] Prejudice occurs when an insurer is denied the opportunity to eliminate or reduce its loss or to properly investigate its claim which did not occur in this case. *Wheeler Moving & Storage, Inc. v. Markel Ins. Co.*, 2012 WL 3848569 (S.D. Fla. 2012); *compare with Att'ys Title Ins. Fund, Inc. v. Rogers*, 552 So. 2d 329 (Fla. 4th DCA 1989).

**B.** <u>**Plaintiffs' Hurricane Irma Damages Exceed the Hurricane Deductible.**</u>

ACE agrees that Hurricane Irma damaged the Plaintiffs' slate tile roof. [ECF 95-1 at 246:10-22; ECF 105-1 at 142:9-20; ECF 105-4 at 19.] ACE asserts, however, that it is entitled to summary judgment "as Plaintiffs' [sic] have Failed to Show Covered Damage Above the Hurricane Deductible." [ECF 74 at 14.] ACE relies entirely on ACE's experts' evaluations and estimates and totally ignores Plaintiffs' experts' opinions on causation and damages. ACE's MSJ on this ground must be denied for the following reasons: (1) construing the record evidence and factual inferences drawn therefrom in a light most favorable to Plaintiffs as the Court must, Plaintiffs have more than satisfied their "threshold burden" of proving that covered damages exceed the Hurricane Deductible; and (2) there are genuine issues of material fact which require the denial of ACE's MSJ.

### i.   Plaintiffs have met their "threshold burden."

A plaintiff seeking to recover under an all-risk policy has the threshold burden of proving that a loss occurred to the insured's property while the policy was in force. "This includes the burden to prove that a covered cause of loss caused damage in excess of the policy's deductible." *Porben v. Atain Specialty Ins. Co.*, 546 F.Supp.3d 1325, 1330 (S.D. Fla. 2021) *c.f. Bray & Gillespie Plaza, LLC v. Lexington Ins. Co.*, 2010 WL 11623659, at *4 (M.D. Fla. Feb. 10, 2010) and *Citizens Property Ins. Corp. v. Manning*, 966 So.2d 486, 487-88 (Fla. 1st DCA 2007). After meeting this initial burden, "[t]he burden then shifts to the insurer to prove that the cause of the loss was excluded from coverage under the policy's terms." *Id.* (citations omitted).

ACE asserts that "Plaintiff's [sic] experts have not quantified any damage being alleged but have relied on ACE's experts for such calculation … which is substantially below the applicable $314,000 hurricane deductible under the policy." [ECF 74 at 14.] This is patently false.

Plaintiffs' experts have provided substantial record evidence of widespread hurricane damages that greatly exceed the Hurricane Deductible and the selective repair scope proposed by ACE. For instance, Plaintiffs' expert, Melo, testified the roof was more than 50% damaged:

> Q:    Okay. Okay. **How did you approximate 50 percent of it being damaged**?
>
> A:    **So that was based on the physical damage that was there.** That's, you know, the displaced and uplifted tiles, the displaced ridges and hips, so that – the physical damage to the actual tiles themselves, and then this wider, more widespread occurrence of pried nails and spalling around the fastener holes. And so there is three different indications of this more widespread condition that I attribute to uplift damage, and so that was evidenced by the uplifted nails that were observable from the surface, the spalling around the nail holes, as well as these uneven protrusions of the nails as viewed from the inside of the attic that indicates that they were pulled up…

[ECF 81-1 at 77:20-78:2 (emphasis added).][5] Melo also documented the "approximate 50%" of the slate roof sections damaged by the winds of Hurricane Irma in his report with "Site Representative Photographs". [ECF 81-6.]

Plaintiffs' expert, Nolton, likewise observed and documented widespread roof

---

[5] Melo correlated the "widespread uplifted slate observed on nearly all roof slopes" to Hurricane Irma through being able to see slates that were "not seated completely" and using "hand manipulation" as a test for over defection ("ranging 1 to even up to 2 ½, 3 inches.") [ECF 81-1 at 36:8-37:10.] *See e.g.*, *El-Ad Residences at Miramar Condo. Assoc., Inc. v. Mt. Hawley Ins. Co.*, 2011 WL 13174642, at *5 (S.D. Fla. Feb. 23, 2011) (finding an expert's opinion reliable when, *inter alia*, he completed manual simulation of an uplift test).

damage. He testified:

> Q:   And we'll go through all the photos and everything that you've got. **You have that you observed uplifted and missing fasteners on all slopes of the roof.** Were these in any particular areas, like were they clustered or were you seeing them more at ridges or valleys, or was it just kind of all over the place?
>
> A:   **It was all over the place.** You'd find some areas where there'd be two or three in an area, right, and you'd -- I mean, everybody's got the picture of the one ridge… there's, I don't know, 10, 12 tile that are -- have issues with them. But in the roof itself you saw that damage across all areas of the roof and you'd see an area where there'd be two or three, then you'd see an individual, individual one, but it was across the roof.

[88-1 at 33:11-34:2.] Referring to his report, he further stated:

> A:   The ones stated **in my report. I saw damaged flashings, I saw broken, chipped slate, I saw missing slate, I saw fasteners that had been pulled up, I saw uplifted slate…**

[*Id.* at 27:24-28:2.] Nolton's report described the damage "on all slopes of the roof," including "numerous broken, displaced, uplifted slate tiles on every slope of the roof" and "damage and uplifted ridge cap flashing and transitional flashings from the flat roofs to the slate roofs" [ECF 88-2 at 3, 11.] Also included in Nolton's report were "Attachments" including drone photographs which marked ("➡️") damage on <u>every</u> roof elevation. The below photographs are just two representative samples:

 

Melo and Nolton both conclude that this roof needs to be replaced[6]. Melo testified: "The full replacement is the only way I see to restore this roof to its pre-Hurricane Irma condition." [ECF 81-1 at 165:1-2.] Nolton reported: "It is our professional engineering opinion that the roof of the residential structure inspected during our site visit cannot be properly repaired and therefore must be replaced." [ECF 88-2 at 12.]  Even the roofing company that maintained Plaintiffs' roof for the 6 years (2010-2016) prior to Hurricane Irma's direct hit on September 10, 2017, concluded "that the roof could not be selectively repaired and that it needed to be replaced." [ECF 80-11 at ¶8.]

Plaintiffs also produced record evidence of the cost to replace the roof, an amount which greatly exceeds the policy's $314,000 Hurricane Deductible. Plaintiffs' expert, Henry Sienema, MA, AIIC, FPOIII, CMEA, SBA ("Sienema") explained: "**Loss Summary per Policy Declarations:** We have stated below in a table the limits specified in Policy Declarations and the loss amounts estimated per the locations and coverage items specified in the Policy Declarations. The total revised damages estimated are **$2,610,853.21** before deductible." [ECF 75-2 at 3.]  Plaintiffs' expert Kobza, a Florida Certified General Contractor who provided an estimate for replacement, explained that it will cost $2,119,535.42 to replace the roof in compliance with the Florida Building Code. [Ex. L, ¶¶18-19.]

---

[6] For the Court's ease of reference, a sampling of photographs from Melo and Nolton's reports depicting the scope of the Hurricane Irma damage is attached as a composite **Exhibit "P"**.

The cases cited by ACE are entirely inapposite. In those cases, unlike here, the plaintiff did not present any evidence to support even a "threshold burden."  In *Porben*, for instance, due to a course of procedural events—namely, untimely filings—, the court barred the insured from introducing <u>any</u> evidence of replacement costs, *Porben* 546 F. Supp.3d at 1329, and then granted the insurer's motion for summary judgment because the insured failed to establish that damage to his property exceeded the policy's deductible. *Id.* at 1332. In *Citizens Property Ins. Corp. v. Manning*, 966 So.2d 486 (Fla. 1st DCA), "the record [was] devoid of evidence establishing the amount of damage caused solely by wind," which was the plaintiff's burden under the policy. *Citizens* at 488. Here, unlike *Porben* and *Citizens*, Plaintiffs timely provided substantial proof of physical property damages that greatly exceed the Hurricane Deductible.[7] Accordingly, Plaintiffs' have clearly met their "threshold burden" of proving that Hurricane Irma damage to their roof exceeds the policy's Hurricane Deductible, such that ACE's MSJ must be denied.

### ii.   There are genuine issues of material fact which require the denial of ACE's MSJ.

This Court should also deny ACE's motion because there are disputed issues of material fact on the scope of covered damages. *See Indian Harbor Ins. v. Beverly Hills*

---

[7] ACE cited to two other cases which are also distinguishable.  *See Bray & Gillespie Plaza, LLC*, 2010 WL 11623659, at *4 (merely denying the plaintiffs' motion to exclude evidence relating to the total insurable value); *see also Sunflower Condo. Assoc., Inc. v. Everest Nat'l Ins. Co.*, 2020 WL 5757085, at *6 (S.D. Fla. Sept. 28, 2020) (merely granting partial summary judgment on an issue upon which everyone agreed – that "[the insured] [was] only entitled to recover damages, if any, in excess of the [p]olicy's hurricane deductibles").

*Apt., Inc.*, 2010 WL 11506355, at *5 (S.D. Fla. Aug. 18, 2010). *Indian Harbor* is directly on point. In *Indian Harbor* the insurer moved for summary judgment on, *inter alia,* whether the insured's damages exceeded the hurricane deductible. *Id.* In support of its motion, the insurer's expert opined that, although there were covered damages, they fell below the hurricane deductible. *Id.* at *3. In opposition to the insurer's motion, the insured presented "written estimates of damages" which exceeded the deductible amount, *id.* at *2, and an "… expert report of engineer Melo, which states that roofing system failures at the subject properties can be attributed to wind damage and water infiltration during Hurricane Wilma". *Id.* at *5. Ultimately, the court denied the insurer's motion because "material issues of fact remain[ed] as to the total value of the losses that can be attributed to Hurricane Wilma." *Id.* Here, like *Indian Harbor*, there are differing opinions from Plaintiffs' and ACE's experts concerning the scope of covered damages. Thus, like *Indian Harbor* because Plaintiffs have presented expert testimony and evidence that Hurricane Irma damages exceed the Hurricane Deductible, genuine issues of fact preclude summary judgement.

Notably, ACE's argument that hurricane damage falls below the deductible is based on a miscalculation of the cost to repair tiles it has acknowledged were damaged by Hurricane Irma. When calculated correctly, these costs alone exceed the Hurricane Deductible. For instance, although ACE's experts determined that there were 1,200 "fractured, displaced and missing tile" [ECF 103-1 at 127:9-15; ECF 105-1 at 164:15-24, 166:20-167:3] that were physically damaged by Hurricane Irma [ECF 103-1 at 127:9-15], ACE's "calculation of damages" of $103,898.11 is based on just 750 slate

tiles. Thus, ACE's estimate undervalues the cost by 37.5% (i.e., $103,898.11 for 750 equals $166,236.97 for 1,200). Also, ACE's "calculation of damages" does not account for the 3:1 slate breakage ratio of replacing the 1,200 slates. [ECF 104-1 at 90:18 – 91:8.] Multiplying the $166,236.97 by 3 brings ACE's estimate to $498,710.91, which is greater than the $314,000 Hurricane Deductible.

More importantly, ACE's experts acknowledge that their count of 1,200 "fractured, displaced and missing tile" is woefully low. For instance, ACE's experts agree that the 1,200 "should not be construed as an assessment of the total damages of the structure at the time of site observation" [ECF 105-3 at 20; ECF 105-1 at 164:15-24], that it does not include any "hidden defects that may exist that were not readily visible" [ECF 105-1 at 159:24-160:22], and that it does not include other "Typical Damage" from the windstorm including "Fastener Backout" and "Spalling at Fastener Hole" throughout this roof. [ECF 107-1 at 178:8-182:19; ECF 107-14 at Photos # 36, 40, 91, 102, 155.] As demonstrated above, ACE's version of the facts is contradicted by record evidence. Accordingly, fact issues preclude summary judgment. *See Templeton v. Bramblet*, 2010 WL 653886, at *2 (M.D. Fla. Feb. 18, 2010) (citing *Scott v. Harris*, 550 U.S. 372, 280 (2007)).

### C.   Loss Of Use Damages Are Covered.

ACE seeks summary judgment on Plaintiffs' loss of use claim, asserting there is no evidence or testimony concerning the appropriate measure of damages or Plaintiffs' normal standard of living. ACE is wrong.

The Policy sets forth the measure of damages for loss of use:

A. LOSS OF USE OF YOUR RESIDENCE

\*   \*   \*

- Additional Living Expenses

    *You* may not be able to live in *your residence* because of a loss covered by this policy. If so, **we'll pay for any increase in** *your* **normal living expenses that is necessary to maintain** *your* **normal standard of living**. *We'll* pay these expenses for the shortest time needed to repair or replace the residence, or to move to a new one.

[ECF 95-4,  p. 59 (emphasis added).]

Here, because the Ferraos must rent a home to live in while Hurricane Irma repairs are underway while paying the normal expenses to maintain the home they own, the cost to rent a comparable home constitutes an increase in the Ferraos' normal living expenses. [ECF 95-1 at 96:4-97:1 (confirming the policy covers the increase in cost to maintain the insureds' normal standard of living at the insured residence, including the cost to rent a comparable home in the event the insured residence is unlivable due to a covered loss).] *See also Highlands Ins. Co. v. Kravecas*, 719 So.2d 320, 321-322 (Fla. 3d DCA 1998) (loss of use coverage is to compensate a homeowner when he is displaced as a result of a covered peril like a hurricane); *State Farm Fla. Ins. Co. v. Shotwell*, 336 So.3d 64, 67-68 (Fla. 3d DCA 2021) (additional living expense awarded for the period of time it took to repair damage caused by a covered peril was proper).  Further, there is no requirement in the Policy that additional living expenses be incurred.[8]  Rather, additional living expenses that will be incurred while future repairs are underway due to a covered loss are recoverable under the Policy.

---

[8] Moreover, at least one court has held that additional living expenses "are immediately payable" even where the policy required additional living expenses to be "incurred". *See Shotwell,* 336 So.3d at 68.

ACE's assertion that Plaintiffs have failed to present evidence of their normal standard of living is also misplaced. Here, Plaintiffs presented proof of facts that are undisputed, namely that their Florida home has 16,000 square feet, 7 bedrooms, and 7 bathrooms; is on the water in Port Royal with open access to the Gulf of Mexico and amazing views; and has a boat dock. [ECF 79-1 at 15:16-16:10; ECF 79-4 at 4, 10.] Further, Plaintiffs retained experts who employed the comparable rental value approach by identifying properties in the same area as the Ferrao home with comparable characteristics to the Ferrao home and evaluating the rental value of those properties, giving due consideration for the similarities and differences between those properties and the Ferrao home. [*Id.* at 15:21-19:8 (explaining adjustments made given the differences in square footage between the Ferrao home and comparables); 24:9-17 (comparing the Ferrao home to other homes based on neighborhood, square footage, number of bedrooms and bathrooms, amount of water frontage, size of dock, etc.).]

Last, ACE asserts that "Additional Living Expenses … were not timely or properly claimed," but cites to zero authority for the proposition that a late disclosure that has already been the subject of a Court Order curing any prejudice, constitutes grounds for entering summary judgment on damages. *See* Order [ECF 48.]  This Court recognized that "the evidence contained in Mr. Sajtar's report is obviously critical to the instant case" and extended the discovery deadline to permit ACE to take discovery on Plaintiffs' theory of damages and "retain an additional expert to rebut Mr. Sajtar's opinions." *Id.* Accordingly, this Court should reject ACE's argument that summary judgment should be granted on grounds of late disclosure.

### D.   Plaintiffs Do Not Seek Termite Damages.

"ACE seeks summary judgment on coverage and/or payment related to termite damage". [ECF 74, p. 12.] ACE's argument should be denied because **Plaintiffs are not seeking the cost to repair termite damage from ACE**. ACE knows this, [ECF 83-1 at 103:6-104:10], but improperly raises the issue anyway. Rather, Plaintiffs seek the cost to replace their roof in compliance with the Florida Building Code which is $2,119,535.42. [Ex. L, ¶¶18-19.] This amount excludes the cost to perform $486,833.93 in repairs to address termite damage. [*Id.* at ¶19.]  This Court should deny ACE's Motion for Summary Judgment on termite damages as moot.

### E.   Plaintiffs' Damages Are Not Speculative.

ACE argues that it "is entitled to summary judgment on Plaintiffs' speculative damages claim," stating that the roof's "future performance in future potential storms is not a recoverable measure of damages in advance of physical damage actually occurring."  [ECF 74 at 20.][9]  ACE relies on *Maranon v. Scottsdale Ins. Co.*, 2022 WL 1597066 (S.D. Fla. Apr. 11, 2022), as well as on *Yanes v. Nat'l Specialty Ins. Co.*, 548 F.Supp.3d 1307 (S.D. Fla. 2021) for the proposition that the insured was not entitled

---

[9] According to ACE, "[i]nsurance policies are not maintenance policies and an all-risk policy does not mean all conceivable losses are covered."  [ECF 74 at 14 (citing *Fayad v. Calrendon Nat'l Ins. Co.,* 899 So.2d 1082, 1086 (Fla. 2005).]  However, ACE fails to note that "[t]he purpose of an all-risk policy is to protect against *all* risks except those expressly excluded." *Fayad*, 899 So.2d at 1089.  Relatedly, "the insurer is held responsible for clearly setting forth what damages are excluded from coverage under the terms of the policy." *Id.* at 1086. Also, "Florida law is clear that [o]nce the insured establishes a loss *apparently* within the terms of an 'all risks' policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted."  *Jorqura v. Metro. Cas. Ins. Co.*, 2013 WL 12156452, *1 (M.D. Fla. Dec. 19, 2013), *c.f. Nat'l Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc.*, 759 F.2d 873, 875 (11th Cir. 1985) (quoting *Hudson v. Prudential Prop. & Cas. Inc. Co.*, 450 So.2d 565, 568 (Fla. 2d DCA 1984) (internal quotation marks omitted) (emphasis added).

to "coverage for additional work to ensure the prevention of future damage." [ECF 74 at 15.]

ACE totally misses the mark on this damage issue. Focusing solely on the *undisputed* testimony of the Plaintiffs' experts' that a slate roof with "pried fasteners" <u>also</u> presents a greater risk of widespread blow-offs during the next significant storm, ACE argues that "the likelihood of a potential reduction of a building material to perform under circumstances which may or may not arise in the future is physical damage and is not covered under the subject policy." [ECF 74 at 13.] Either by design or inadvertence, ACE failed to include the complete answer from Plaintiffs' experts on this topic. [ECF 81-1 at 163:6-164:3.] For instance, when Melo was asked whether the "pried fasteners" themselves evidence wind uplift damage, he said:

> A:    That's correct. **I believe that it – that does constitute damage. That does constitute – you know, any time that these nails are pried out, it certainly has an impact. It is considered damage and it reduces the pull-out capacity of those fasteners.**

[*Id.* at 182:11-22 (emphasis added)].

During his deposition, Melo provided a very compelling explanation of the "progression of damage" which supported his opinion that "pried fasteners" are physical damage from Hurricane Irma:

> Q:    So for tile roofs, it begins with uplift. Right?
>
> A:    Now, tile can be uplifted and not damaged so long as the tiles themselves are not damaged or the fastener is not pulled out. So if you just lift the tile a little bit and it comes back down and there is no evidence that it affected the fastener or the tile cracked, then that does not constitute damage.
>
> However, if the tile cracks or if the fastener cracks or if the tiles above it crack, then that does constitute damage.

So the progression of damage is, one, uplifting the tiles.

**Then, two, the prying of nails and the spalling around the fastener.**

Then, three, you are going to start getting breakage either to that immediate individual tile or the tile above it or the surrounding tiles that were impacted by the uplift.

And then, four, it will be complete back-out of the fastener from its nail hole or basically complete failure of the fastener, and then you get the blow-offs of individual tiles.

And then five would be once you are not getting any individual tile, you are getting clusters of tiles that are blown off.

So that is kind of how it happens. And, you know, it is my experience that, you know, the -- for example, if a roof has, for all intents and purposes, 10 blown off tiles, right, you are usually going to see 30 cracked and broken tiles in addition to those 10 blow-offs. Then you are going to see 50 to 70, you know, instances of, you know, the lower portion of the damage progression.

So the lower portions of damage tend to be much more widespread, and then the more severe types of damage or progression of damage tend to be less widespread.

[ECF 81-1 at 183:23-185:10 (emphasis added).]

ACE cites to a number of cases which are clearly distinguishable. In *Maranon*, the insured made a claim for the replacement of his cast iron drain line that was allegedly deteriorated under a policy that covered "direct physical damage caused by water overflow or discharge during the Policy Period." *Maranon,* 2022 WL 1597066 at *5. "Plaintiff asserted the claim because water was draining slowly not because it caused any damage." The court granted the insurer's motion for summary judgment, "find[ing] that it is undisputed that the plaintiff suffered no water damage as a result of a blockage to his deteriorated pipes during the Policy period." *Id*. Similarly, in *Yanes*,

the court found that the insured's experts' affidavits "fail to carry [the insured's] burden," to show damage to the sanitary line at issue." *Yanes,* 548 F.Supp.3d at 1317. Unlike *Maranon* and *Yanes,* here Plaintiffs have provided substantial record evidence showing how the roof system was damaged by Hurricane Irma (*see* Pls.' First Argument in Section B) and why the repair method proposed by ACE is not appropriate because it does not comply with the Florida Building Code, the matching requirement of the Policy, etc. [ECF 80.]

ACE also cites to *Bodo v. GeoVera Specialty Ins. Co.*, Case No. 8:18-cv-678-T-30AAS, 2019 WL 9598314 (M.D. Fla. Mar. 8, 2019), for the contention that there is no coverage to replace a deteriorated product that "remained operable and had not caused physical damage." [ECF 74 at 15.] *Bodo* is inapposite. *In Bodo,* the insured "admitted that she had no direct physical loss to the [p]roperty." *Bodo, 2019 WL 9598314, at \*1.* Thus, the court held that the insured did not establish direct physical loss to her property. *Id.* Here, unlike in *Bodo,* Plaintiffs have submitted substantial evidence of covered damage, including expert testimony that "pried nails," tile breakage, damaged ridge head, and other roof damage was caused by Hurricane Irma. [ECF 81-1 at 163:6-164:3, 182:11-22.]

ACE also cites to *Homeowners Choice Property & Casualty v. Miguel Masons*, 211 So.3d 1067 (Fla. 3d DCA 2017), stating there was "no coverage for a damaged drain line when there was no evidence it had caused damage to the surrounding areas." Recognizing that "it is not inconceivable that such evidence [of

water damage] may surface in the future," the court remanded the case to the trial court to enter summary judgment in favor of the insurer "without prejudice to the [insured's] filing another claim of loss at a later date, if appropriate." *Id*. *Homeowners Choice* is inapposite. Here there is substantial record evidence of wind damage from Hurricane Irma, including that the "pried nails" themselves "constitute damage" [ECF 81-1 at 182:11-22.][10]

Because Plaintiffs have cited to evidence in the record of direct physical damage from "prying nails," and because ACE's cases are distinguishable (and actually support Plaintiffs' contentions), ACE's MSJ in Section E must be denied.

## F.   ACE's Water Damage Exclusion does not apply.

ACE asserts that there is no coverage for water damage to the painted ceiling in Plaintiffs' library because said damages are purportedly excluded under the Policy's Water Damage exclusion.[11] This is entirely false. The Water Damage exclusion states:

> (2) Water Damage. We won't pay for direct loss **caused by any kind of surface or underground water.**  This includes floods, waves, spray (whether or not it is driven by wind), seepage, leakage and water pressure. We won't pay for ensuing loss either, unless the direct cause is fire, theft or explosion.  This

---

[10] ACE failed to properly identify portions of the record to support its arguments. *See Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 643 F. Supp. 2d 1356, 1358 (S.D. Fla. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added)). Notably, there is only one citation to the Record in the approximately three-and-a-half-page narrative constituting Section E of ACE's Motion for Summary Judgment. [ECF 74 at 19-23.] *See Jenkins v. MSC Cruises (USA), Inc.*, 2019 WL 2010241, at *1 (S.D. Fla. Mar. 22, 2019)  ("The Court has no obligation to go digging through the record to find the support that [the party] has omitted and therefore ignores those factual assertions."); *see also Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statements of fact.").

[11] Contrary to ACE's representation, Plaintiffs do not seek HVAC water damages as part of their claim. [ECF 77-1 at 56:21-57:9 (acknowledging that there was a water leak in the gym which was the result of HVAC that is not part of this claim)], and Plaintiffs' repair estimates do not include any damages related to HVAC leaks. [ECF 75-2 and Ex. L (Kobza Aff.) at Ex. B.]

> *exclusion* doesn't apply to *personal property* that is not at any location an *insured person* owns, rents, occupies or controls.

[ECF 95-4, p. 57 (emphasis added).] The Water Damage exclusion only applies to direct loss caused by "surface or underground water." It does not apply to wind-driven rain that enters the dwelling through the roof. *See e.g., Atl. Mut. Ins. Cos. v. Lotz*, 384 F. Supp. 2d 1292, 1302 (E.D. Wis. 2005) ("a loss caused by rainwater is not excluded under the water damage exclusion").

ACE also misrepresents that Plaintiffs' expert "agrees the water damage to the library was not the result of damage from Hurricane Irma as the damage occurred sometime after 2019". The opposite is true. [ECF 75-1 at 29:5-30:5 (confirming library damages were the result of Hurricane Irma).] ACE's MSJ should be denied.

### G.   The Policy Covers Matching.

ACE asserts that the Policy only covers "direct physical damage to covered property" and therefore does not cover "matching". Neither assertion is true. First, there can be no question that matching is covered under the policy because the policy includes a matching provision:

PAIRS, SETS AND PARTS

Loss to one piece in a pair or set, which can't be used without the missing piece, will be treated as loss to the entire pair or set. However, loss to one part of property consisting of several parts when whole, which is still usable without the missing part will be treated as a loss to that part only.

[ECF 95-4, p. 75.] Here, the roof cannot be used without the missing and damaged tiles. Accordingly, pursuant to the above provision, if matching tiles cannot be located, the loss should be treated as a loss to the entire roof. Moreover, as acknowledged by

ACE, the above provision is a matching provision under which ACE will attempt to locate matching tile and will need to manipulate undamaged tile if matching tile is unavailable. [ECF 95-1 at 225:25-228:5 (discussing matching tiles and noting that "one aspect that's important in regard to this investigation on this claim is taking a look at all the facts and see what is necessary to get the insured back to pre-loss condition.").]

Further, ACE misrepresents that its Policy covers only "direct loss" and therefore matching is not covered. Contrary to ACE's representation, coverage is not limited to "direct loss." Rather, the Policy insures "against financial loss if the things you own are damaged or lost" and covers "*your* property against physical damage or loss." In fact, **there is no reference to "direct loss" anywhere in the coverage grant** (the Losses We Pay For section). Rather, "direct loss" is only referenced in Losses We Won't Pay For and applies only where noted in ACE's exclusions. The relevant Policy language states:

> Part I: Your Property Coverage
>
> This part of *your* Home Policy covers you and your family **against financial loss** if the things you own are damaged or lost. *We* tell *you* about this coverage in "Residences and Personal Property". The specific items we cover in each are described in "What We Cover".
>
> What kind of losses will *we* pay for? *We* cover *your* property against **physical damage or loss**, except the ones specifically described in "Losses We Won't Pay For".
>
> \*   \*   \*
>
> LOSSES WE'LL PAY FOR
>
> So far, *you've* seen that *we* cover *your residences* and a wide range of *personal property*.

What are these things covered against?  Simple.

Property described in 'What We Cover' is covered against risks of physical loss except under certain circumstances described in the next section.

LOSSES WE WON'T PAY FOR

In this section of *your* Home Policy, we describe some circumstances when *we* won't pay for a property loss.  *We* call these circumstances *exclusions*.

These *exclusions* apply to everything covered under 'Part 1:  Your Property Coverage', except as noted otherwise.  As *we* describe each *exclusion, we'll* tell *you* which kind(s) of property it doesn't apply to.

*We'll* also tell you whether an exclusion applies to *direct loss,* to *ensuing loss,* or to both.  A *direct loss* is a property loss caused directly by a particular set of circumstances.  An *ensuing loss* is a property loss caused indirectly by those circumstances…"

[ECF 95-4, pp. 54, 56 (emphasis added).] Accordingly, ACE's reliance on cases interpreting policies that limit coverage to "direct physical damage" is misplaced. Those cases are inapposite here.

Moreover, ACE cannot circumvent Florida's matching statute because even ignoring the Pair, Set and Part matching provision, the plain language of the Policy covers matching. Here, the Policy covers the Insureds' "financial loss if the things they own are damaged or lost" and the Insureds' "property against physical damage or loss." With respect to the latter, the Policy requires payment to repair and restore property using "like kind and quality," to wit:

HOW MUCH WE'LL PAY

*   *   *

YOUR PROPERTY COVERAGE

This section explains how much *we'll* pay for a loss to *your residence* and personal belongings…. *We'll* pay the replacement cost of the property except under some

circumstances described in Your Residences And Personal Property below. Replacement cost.  The *replacement cost* is the cost of replacing property **with property of a like kind and quality**.  *We'll* pay today's cost for comparable property, even if the property you're replacing was old and had down in value.

[*Id.* at p. 68 (emphasis added)]. Pursuant to an endorsement, the Policy expressly requires payment on a replacement cost basis without deduction for depreciation, whether repairs are performed or not. [ECF 95-1 at 271:18-272:3; ECF 95-4, p. 93.]

As evidenced by the cases cited by ACE and a case not cited by ACE -- *2000 Island Blvd. Condo. Ass'n v. QBE Ins. Corp.*, 2012 U.S. Dist. LEXIS 206364* (S.D. Fla. 2012) -- Florida courts have interpreted "like kind and quality" language to require matching. In *2000 Island Blvd. Condo. Ass'n* the court explained:

At issue is whether matching of covered property is covered under the policy.

As an initial matter, the Court observes that matching of replacement building components to undamaged original building components can logically be arrived at by two means.  The first is by installing replacement components that are "of like kind and quality" as the original components; uniformity is thus achieved without the replacement of undamaged original components.  If that is not possible because, for example, components "of like kind and quality" are unavailable, a second option to achieve matching is to replace all like components (i.e. windows), both damaged and undamaged so that any damaged components that are replaced are identical to the undamaged ones. *See e.g. Strasser v. Nationwide Mut. Ins. Co.*, No. 09-60314-CIV-SEITZ/O'SULLIVAN,2010 U.S. Dist. LEXIS 21632, AT *1-2 N. 1(S.D. Fla. Feb. 22, 2010).

\*   \*   \*

In this case, however, Island maintains that by the policy's own terms, the entire building or structure is "covered property," and thus, damage to the building not only includes physical damage to its individual components, but also physical loss of the building's original condition due to mismatched replacement components. In sum, regardless of which method QBE used to compensate Island for its loss, Island is entitled to matching.

*2000 Island Blvd.*, 2012 U.S. Dist. LEXIS 206364 at *5-6 (internal citations omitted).

In *Strasser v. Nationwide Mut. Ins. Co.*, 2010 WL 6677945 (S.D. Fla. 2010), a case

cited by ACE, the Court similarly found that if an insurer had elected to repair the property, the policy language requiring the insurer to "repair, rebuild or replace the property with property of like kind and quality" would have required matching. The court in *Ocean View Towers Ass'n v. QBE Ins. Corp.*, 2011 U.S. Dist.LEXIS 147579* (S.D. Fla. 2011), also acknowledged that language requiring "like kind and quality" is analogous to "matching."

In *Ocean View*, the Loss Payment provision only required "like kind and quality" if the insurer elected to repair, and because the insurer made no such election, the Court determined that matching was not required. The Court noted, however, that despite its ruling, the insurer "should ensure coverage for "matching" consistent with standard industry practice where repairs concern "**any continuous run of an item or adjoining area" for materials such as** painting, wallpapering, siding, carpeting, and **roof tiles**." *Id.* (emphasis added). Accordingly, this Court should hold as a matter of law, and as acknowledged by ACE's corporate representative, that the Policy covers matching. [ECF 95-1 at 225:25-228:5.]

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask this Court to deny ACE's MSJ.

Dated: September 26, 2022.

Respectfully submitted,

/s/ Ricardo A. Reyes
Ricardo A. Reyes, Esq. (FBN 864056)
rar@tobinreyes.com
Carrie S. Robinson, Esq. (FBN 0354030)
csrobinson@tobinreyes.com
TOBIN & REYES, P.A.
225 N.E. Mizner Blvd., Suite 510
Boca Raton, FL 33432
Tel: (561) 620-0656
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via

CM/ECF on September 26, 2022, on all counsel or parties of record:

| | |
|---|---|
| Edward K. Cheffy, Esq.<br>David A. Zulian, Esq.<br>Debbie Sines Crockett, Esq.<br>Cheffy Passidomo, P.A.<br>4100 W. Kennedy Blvd., Suite 335<br>Tampa, FL 33609<br>Tel:  (239) 261-9300<br>*Attorneys for Plaintiffs* | Meghan C. Moore, Esq.<br>Nicole A. Josephy, Esq.<br>FLASTER GREENBERG PC<br>2255 Glades Road, Suite 324A<br>Boca Raton, FL 33431<br>Tel: (561) 961-4508<br>*Attorneys for Plaintiffs* |
| Kristin Wood Elza, Esq.<br>Thomas Keller, Esq.<br>Butler Weihmuller Katz Craig LLP<br>400 N. Ashley Drive, Suite 2300<br>Tampa, Florida 33602<br>Telephone: (813) 281-1900<br>Facsimile: (813) 281-0900<br>*Attorneys for Defendant* | |

/s/ Ricardo A. Reyes
Ricardo A. Reyes, Esq.
TOBIN & REYES, P.A.

30